**TIGER INTERNATIONAL, INC. and the Flying Tiger Line, Inc., Petitioners,**

v.

**CIVIL AERONAUTICS BOARD,**
**Respondent.**

**No. 75–1774.**

United States Court of Appeals,
Ninth Circuit.

May 18, 1977.

M. Laurence Popofsky, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., Charles N. Brower, John Lewis, White & Case, Washington, D. C., argued, for petitioners.

Griffin B. Bell, U. S. Atty. Gen., U. S. Dept. of Justice, Civ. Div., Jerome Nelson, Gen. Counsel, Civil Aeronautics Bd., Thomas E. Kauper and Carl D. Lawson, Antitrust

Div., App. Section, U. S. Dept. of Justice, Washington, D. C., argued for respondent.

Before GOODWIN and WALLACE, Circuit Judges, and FERGUSON,* District Judge.

WALLACE, Circuit Judge:

This appeal comes to us in the form of a petition to review certain orders of the Civil Aeronautics Board (CAB). 49 U.S.C. § 1486. The petitioners, Tiger International, Inc. (TI)[1] and The Flying Tiger Line Inc. (FTL), argue that the CAB had no jurisdiction to issue Order 70–6–119 and that it acted beyond its authority, in an arbitrary and capricious manner, without a basis in substantial evidence, and in violation of due process in issuing Order 73–12–106 and Order 75–2–1. Because we find that we have no jurisdiction to review Order 70–6–119, we dismiss the petition as to that matter. We affirm both Order 73–12–106 and Order 75–2–1.

I

In July 1969 The Flying Tiger Line Inc. (Flying Tiger),[2] an air carrier specializing in transporting cargo, requested the CAB to disclaim jurisdiction over certain aspects of a proposed corporate reorganization and to approve the transfer of the carrier's certificates of public convenience and necessity to a new corporation. Under the proposed reorganization, the carrier would create a holding company, TI, and a wholly-owned subsidiary, FTL. FTL would be an operating company and would continue the air cargo business of the predecessor carrier. It was to FTL that Flying Tiger desired to transfer its certificates of public convenience and necessity.

The primary purpose for the reorganization into a holding company format was to facilitate diversification into businesses other than air transport. The air carrier industry traditionally has been cyclical, with alternating periods of prosperity and business downturn. The management of Flying Tiger believed that through diversification it could achieve a more stable profit pattern, make more efficient use of working capital in excess of aviation needs, achieve economies and reap more fully the benefits of certain provisions of the tax laws.

On May 5, 1970, the CAB entered its Order 70–6–119 (1970 Order)[3] in which it refused to disclaim jurisdiction over the reorganization. Rather, it asserted jurisdiction under section 408 of the Federal Aviation Act (the Act), 49 U.S.C. § 1378,[4] and pursuant thereto approved the reorganization subject to several conditions designed by the agency. One of those conditions (condition 3) required that TI

> or any other company within the existing Flying Tiger Corporation system of affiliates and subsidiaries shall not in any calendar year, and without prior Board approval, either individually or jointly enter into any inter-company transactions with or affecting [the air carrier, FTL] which

---

* Honorable Warren J. Ferguson, United States District Judge, Central District of California, sitting by designation.

1. Until July 1, 1974, Tiger International, Inc. was called The Flying Tiger Corporation. Throughout this opinion we use the initials "TI" to represent the company under both of its names.

2. This corporation is different from the corporation with the same name which we refer to as FTL.

3. The 1970 Order did not become effective until June 19, 1970, when it was approved by President Nixon. Presidential approval was necessary because the air carrier was involved in international traffic. Federal Aviation Act § 801, 49 U.S.C. § 1461.

4. Because we determine in this opinion that we have no jurisdiction to review the 1970 Order, see section II *infra*, we deem it unnecessary to set out in the text the factual background and the arguments of the opposing parties bearing on the validity of that Order. Basically, the issue concerns the jurisdiction of the CAB to regulate a corporate reorganization of the type involved in this case.

will have an aggregate value of $100,000 or more.[5]

On June 24, 1970, the Flying Tiger management accepted the conditions of the 1970 Order. Shortly thereafter, in Order 70–6–153 (June 30, 1970), the CAB directed Flying Tiger to transfer its certificates of public convenience and necessity to FTL.[6]

Between 1970 and 1971, TI and FTL commenced their diversification program by acquiring all of the common stock of North American Car Corporation (NAC). In 1971, the diversification continued when NAC purchased the common stock of National Equipment Rental Limited (NER).

In July 1973, TI, FTL, NAC and NER entered into a tax allocation agreement. Because the operation and ramifications of this agreement bear significantly on the resolution of several of the issues raised in this appeal, a detailed explanation of its provisions is necessary.

Under the agreement, the holding company, TI, could, if it elected to do so, file a consolidated federal income tax return—that is, one covering all subsidiaries or affiliates of TI. Each subsidiary, however, was to compute its own tax liability as if it were filing a separate tax return and then to pay to TI the amount of that liability. If the subsidiary had no liability but rather would be entitled to a refund if it filed a separate return, TI was to pay that amount to the subsidiary. Also, TI was to give to each subsidiary except FTL a credit for the amount of any net operating losses or tax credits generated by that subsidiary and applied in computing the consolidated tax return.[7] To FTL, however, TI was to give not credits but an immediate cash payment equaling the tax savings achieved from the

use of FTL's tax credits and operating losses. Although entered into in 1973, the tax allocation agreement provided that it was to have effect in the 1971 and 1972 tax years, as well as prospectively.

The operation of the tax allocation agreement can be clarified by presenting an example. In 1973, FTL's independent tax liability would have been approximately $10,960,000. The Tiger group's consolidated tax obligation, however, was less than one-third that amount, primarily because of the net operating losses of NAC. In a conscious attempt to offset FTL's pre-tax book profits, NAC had both greatly increased its capital purchases—by buying in 1973, for example, 5,500 new railroad cars at a cost of $110,000,000—and adopted an accelerated method of depreciation. Thus the tax allocation agreement would have required FTL to pay the $10,960,000 to TI, which in turn would have used a fraction of that amount to pay the consolidated tax and the balance to meet the capital needs of the member subsidiaries and to continue the diversification program.

Because the tax allocation agreement constituted an intercompany transaction within the scope of condition 3 of the 1970 Order, TI and FTL applied to the CAB to secure its approval of the transaction. They did not, however, request a hearing on the matter, and the CAB did not order one. The CAB thereafter refused to approve the agreement as submitted, substituting instead its own plan. Order 73–12–106 (December 26, 1973) (1973 Order). Under the CAB approach, FTL cannot transfer to TI its tax-sheltered profits in the form of "independent tax liability" and FTL is permitted to pay to TI only its proportionate share

---

**5.** In its Order 74–5–90 (May 17, 1974), the CAB revised the 1970 Order by raising the dollar limit from $100,000 to $1,000,000.

**6.** Whereas the CAB based its authority to regulate the corporate reorganization on section 408, 49 U.S.C. § 1378, it ordered the certificates of public convenience and necessity transferred pursuant to its authority under section 401(h), 49 U.S.C. § 1371(h). TI and FTL have not contested the CAB's jurisdiction under section 401 to regulate the transfer of the certificates.

**7.** Although there is some uncertainty from the agreement *when* each subsidiary could redeem its credits, it appears that the credits were to be redeemed by offsetting them against the separate return tax liability of the subsidiary—which under the agreement is payable to TI—in those subsequent years when such a liability exists.

of the consolidated tax liability. The CAB further directed FTL to issue its own credits to other members of the TI group whose losses and tax credits are used to shelter FTL income.

The 1973 Order was, by its own terms, "a temporary measure, to be superceded by" a final CAB order in the then pending Air Carrier Reorganization Investigation (ACRI). 1973 Order, at 3 n.4. With its 1970 reorganization, FTL had become the second air carrier to adopt a holding company format for diversification purposes. United Air Lines was the first,[8] and Braniff Airways attempted to become the third with an application to the CAB some time before March 1972. In response to this new phenomenon in the air carrier industry, the CAB instituted ACRI in March 1972. The purpose of the investigation was to determine "whether air carriers should be permitted to diversify their business activities through the creation of holding companies, and, if so, what policies, rules and/or regulations, if any, should the [CAB] adopt in order to regulate this form of diversification . . .." Order 75–10–65, at 1 (October 17, 1975). ACRI resulted in final orders, Orders 75–10–65 et seq. (ACRI Orders), which contain a comprehensive regulation of the holding company format, including regulation of tax allocation agreements. The ACRI Orders' effective date is May 14, 1976, at which time the measure

here under attack, the 1973 Order, ceased to be operative.[9]

After the CAB in its 1973 Order significantly modified the tax allocation agreement, TI and FTL petitioned for reconsideration. Again they did not request a hearing. On February 3, 1975, the CAB denied that petition in its Order 75–2–1 (1975 Order). TI and FTL then petitioned this court for a review of the 1973 and 1975 Orders and, indirectly, for a review of the 1970 Order.

## II

The only basis for our jurisdiction over this controversy is section 1006(a) of the Act, 49 U.S.C. § 1486(a), which provides in part:

> Any order, affirmative or negative, issued by the Board or Administrator under this chapter . . . shall be subject to review by the courts of appeals of the United States or the United States Court of Appeals for the District of Columbia upon petition, filed within sixty days after the entry of such order, by any person disclosing a substantial interest in such order. After the expiration of said sixty days a petition may be filed only by leave of court upon a showing of reasonable grounds for failure to file the petition theretofore.

8. When United Air Lines created its holding company in April 1970, the CAB disclaimed jurisdiction under section 408 of the Act, 49 U.S.C. § 1378. See Order 69–4–67 (February 17, 1969). The CAB refused to disclaim jurisdiction of the later Flying Tiger diversification because it construed an intervening amendment to section 408, Act of August 20, 1969, Pub.L.No. 91–62, 83 Stat. 103, amending 49 U.S.C. § 1378, as giving it jurisdiction over such transactions.

9. The ACRI Orders obviously did not moot the present appeal, however, because the 1973 Order was effective for approximately two and one-half years, a period not affected by the ACRI Orders, which are only prospective in effect. Our opinion on the validity of the 1973 Order will resolve a live controversy: May TI and FTL apply their tax allocation agreement as submitted to the period prior to May 1976? Our affirmative response would permit the

transfer of large amounts of funds from FTL to TI.

Also, review of the ACRI Orders has been sought in the District of Columbia Circuit. In light of the similarity between some aspects of the ACRI Orders and the 1973 Order under review here, and given the pending review of the former in the District of Columbia Circuit, we requested the parties to submit supplemental memoranda discussing whether we should defer our decision until after the District of Columbia Circuit handed down an opinion on the ACRI Orders. The CAB argued for deferral; TI and FTL were opposed to such a course.

After reviewing the supplemental memoranda, we ordered this appeal submitted. In our view, a stay of submission was inappropriate because of the likelihood that disposition of the ACRI appeal would turn on issues of fact and law distinct from those raised here.

■ The CAB concedes that the petition of TI and FTL to review the 1973 Order, as reaffirmed in the 1975 Order, is timely under section 1006(a).[10] It contends, however, that we lack jurisdiction to review the 1970 Order because TI and FTL failed to petition for review within 60 days of its entry.[11]

TI and FTL attempt to circumvent this jurisdictional defect with three theories. First, they argue that the 1970 Order is a "necessary predicate" to the later two orders and that it therefore must be considered first. In short, TI and FTL are presenting the three orders as so intertwined as not to permit separate review.

■ While granting that there is a direct connection between the 1970 Order, particularly condition 3, and the 1973 and 1975 Orders, we find the argument of TI and FTL unpersuasive. As a practical matter, we can refuse to review the 1970 Order and still adequately address the challenges to the 1973 and 1975 Orders on the merits. Indeed, the brief of TI and FTL proposes such a disposition in the event we do not invalidate the 1970 Order. Further, our statutory grant of jurisdiction, section 1006(a) of the Act, speaks in terms of individual orders: "Any *order* . . . shall be subject to review . . . upon petition, filed within sixty days . . .." (Emphasis added.) In our view, this language does not permit "intertwining" of orders for review purposes, that is, using a timely petition to review an order as a means of bringing before us a related order for which the appeal period has run.

■ Second, TI and FTL seek the benefit of the last sentence of section 1006(a) which empowers the courts to permit late filing of a petition for review "upon a showing of reasonable grounds for failure to file the petition theretofore." They argue that the right to file a timely petition with the Court of Appeals "was more apparent than real," because under the terms of the Order they were required either to abandon the reorganization or to carry it forward subject to the CAB's burdensome conditions. Thus, in effect, they argue that they had no practical alternative to accepting the 1970 Order.

We reject this argument. The decision to appeal or not is often difficult, especially in cases such as this where the judgment of the agency grants part or most of the benefits sought but the applicant cannot accept those benefits and at the same time appeal the judgment.[12] Nevertheless, TI and FTL made their decision. They accepted the reorganization subject to the CAB's conditions and forewent an appeal. The circumstances surrounding that conscious decision do not, in our view, constitute the "reasonable grounds" for delay contemplated by section 1006(a).

Finally, TI and FTL argue that where an agency has acted beyond the scope of its jurisdiction or authority, an aggrieved party is not limited to the normal statutory review procedures. In support of their contention, they cite *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), and various lower court opinions following that decision. *Leedom* stands for the general

10. When a motion for rehearing or reconsideration of an order is made in a proceeding before the CAB, time for filing the petition to review that order *does not begin to run until the CAB acts on the motion. Outland v. CAB*, 109 U.S. App.D.C. 90, 284 F.2d 224, 226–28 (1960).

11. Time limitations for certiorari, appeal and review set out in *statutes* are uniformly regarded as jurisdictional. *See generally Schacht v. United States*, 398 U.S. 58, 90 S.Ct. 1555, 26 L.Ed.2d 44 (1970); H. Hart & H. Wechsler, The *Federal Courts and the Federal System* 1593 (2d ed. P. Pator, *et al.* 1973).

12. The 1970 Order made "full acceptance of the conditions" of that Order a prerequisite to obtaining CAB approval of the transfer of Flying Tiger's certificates to FTL. 1970 Order, at 10 (condition 8). Obviously, FTL could not engage in the air cargo business without the certificates. TI and FTL were therefore faced with an all or nothing situation: either they could refuse to accept the 1970 Order, halt the reorganization and petition for review or they could accept the Order and proceed with the reorganization subject to the CAB's conditions. But they could not, as a practical matter, both reorganize and petition for review.

proposition that the review provisions in some of the various acts governing administrative agencies do not limit the original jurisdiction of the district courts under general jurisdiction grant statutes. Thus when an administrative decision is void because made, for example, without subject-matter jurisdiction or in excess of statutory authority, that decision may, in effect, be collaterally attacked.

In advancing this argument, TI and FTL fail to perceive the significance of one crucial distinction. The collateral attack in all the cases upon which they rely was made in a separate proceeding in the district court and in each case the court had an *independent* basis for exercising jurisdiction, such as the presence of a federal question, 28 U.S.C. § 1331, or the presence of an issue arising under a federal statute regulating commerce, 28 U.S.C. § 1337. In each case, the court looked to the pertinent agency action review provision, generally one framed like section 1006(a), to determine whether Congress intended by that statute to limit the court's independent source of jurisdiction. There was never any discussion whether the uncomplied-with review provision *conferred* jurisdiction on the district court.

In our case, either section 1006(a) confers jurisdiction on this court or we have no jurisdiction to review directly the CAB's orders. Other than section 1006(a), there is no statute which grants us subject-matter jurisdiction over the issues raised in this case. Because the bounds of our jurisdiction are set by Congress, *Sheldon v. Sill*, 49 U.S. (8 How.) 441, 12 L.Ed. 1147 (1850); *Malamud v. Sinclair Oil Corp.*, 521 F.2d 1142, 1146–47 (6th Cir. 1975); *Edwards v. Selective Service Local Board No. 111*, 432 F.2d 287, 290 (5th Cir. 1970), *cert. denied*, 402 U.S. 952, 91 S.Ct. 1637, 29 L.Ed.2d 122

(1971), when TI and FTL ask us to disregard the only available congressional grant of jurisdiction and to review the 1970 Order *in spite of* section 1006(a), they in effect concede our lack of power to make that review.[13]

Therefore, on the ground that we have no jurisdiction, we dismiss the petition of TI and FTL insofar as it seeks review of the 1970 Order.

### III

In resolving the challenges to the 1973 and 1975 Orders, our initial task is to determine what standard, if any, the CAB must meet before it may properly withhold its approval of or modify an intercompany transaction presented to it for approval pursuant to an order like the 1970 Order, condition 3. Our second task is to identify what standard of judicial review governs our evaluation of the CAB's decision. Finally, we must determine from the record before us whether that decision is sustainable on appeal.

### A

The CAB does not contend that it has plenary power over intercompany transactions within the scope of condition 3 of the 1970 Order or that it may approve, reject or modify such transactions at will. Rather, the CAB argues that it should be bound to a "just and reasonable" standard: that is, if the proposed intercompany transaction is just and reasonable the CAB is required to approve it; if not, the CAB may withhold approval or modify the transaction to make it just. It is argued that the basis for this standard is section 408(b) of the Act, 49 U.S.C. § 1378(b), which provides that the CAB, when approving by order the consolidation, merger or purchase of an air carrier, may include in the order "such terms and

---

**13.** *See generally* Note, *Jurisdiction to Review Federal Administrative Action: District Court or Court of Appeals*, 88 Harv.L.Rev. 980 (1975).

Perhaps concerned that a collateral attack on an agency order could be successful only in district court, TI and FTL brought a separate action in federal district court in the Central District of California challenging the CAB's jur-

isdiction to issue the 1970 Order. Civil Action No. 74–1037–WMB. They are seeking there a declaratory judgment and injunctive relief.

It goes without saying that the discussion in this opinion concerning our jurisdiction to review the 1970 Order applies only to this court. We intimate no views on the jurisdiction of the district court over the matter.

conditions as it shall find to be *just and reasonable* and with such modifications as it may prescribe . . . ." (Emphasis added.) It was pursuant to this statutory provision that the CAB imposed condition 3 of the 1970 Order, and, of course, it was pursuant to condition 3 that TI and FTL submitted the tax allocation agreement to the CAB for its approval.

It should be noted at this point, however, that the term *just and reasonable* in section 408(b) refers to and is a limiting modifier of the "conditions" that the CAB may affix to its orders. The term, read in context, does not refer to agency action taken pursuant to those conditions, nor does it refer to air carrier activities. Nevertheless, in overseeing intercompany transactions the CAB has traditionally referred to the transactions either as "just and reasonable and in the public interest" or as not "just and reasonable" as a way of stating its conclusion.[14]

 As a practical matter of administrative adjudication and appellate review, the language of the "just and reasonable" standard is so vague and inherently subjective that it fails to offer meaningful guidance. Indeed, without elaboration or refinement, the standard as stated carries the risk of converting the CAB's limited authority into a plenary power and of shielding inconsistent, capricious or arbitrary administrative action. The CAB, however, appears to have poured meaning into the "just and reasonable" standard, at least in the present case, by referring to the purposes underlying condition 3. In the 1970 Order, the CAB stated that the purpose was

"to protect the public against any impairment of the air carrier's certificate obligations which might arise by reason of the relationships or transactions among [TI] and its subsidiaries and affiliates . . ." 1970 Order, at 7.[15] Thus by reference to the purpose of condition 3, the CAB's task when reviewing an intercompany transaction becomes one of determining whether that transaction impairs or is reasonably likely to impair the air carrier's ability to fulfill its certificate obligations.[16] The task is not to determine whether the agreement is just and reasonable in the abstract. Accordingly, if the CAB finds a reasonable likelihood of impairment of the air carrier's ability to perform its certificate obligations, it may reject or modify the proposed transaction; otherwise, it must grant its approval.

We accept this refinement of the "just and reasonable" standard. A standard of administrative review that focuses on the impairment of an air carrier's ability to fulfill its certificate obligations is both more meaningful and more susceptible to intelligent and consistent application than the inherently vague language of the "just and reasonable" standard. Further, the "impairment" standard is so cast that it requires the CAB to articulate the carrier's certificate obligations, to analyze carefully the proposed intercompany transaction, and to identify from the evidence the pernicious or disruptive consequences to the carrier, if any, reasonably likely to flow from the proposed agreement. The very objectivity of this process minimizes the risk of arbitrary

14. For example, for many years the CAB reviewed intercompany transactions involving the Hughes Tool Company and Trans World Airlines. When it approved those proposed transactions, the CAB would declare them to be "just and reasonable and in the public interest." *See Hughes Tool Co. v. Trans World Airlines, Inc.*, 409 U.S. 363, 375–76, 93 S.Ct. 647, 655, 34 L.Ed.2d 577 (1973).

15. Recently, when called upon to restate the purpose of condition 3, the CAB reiterated this language concerning impairment of the air carrier's certificate obligations. Order 75–5–125, at 4 n.11 (May 3, 1975).

16. The CAB equates an "impairment of certificate obligations" standard with its "just and reasonable" standard in this manner:

When the Tigers returned to the Board in 1973 [seeking approval of the tax allocation proposal], the Board was called upon once more to make the same type of determination [made in the 1970 Order] regarding the potential "impairment of the air carrier's certificate obligations." For this reason, the Tigers' tax agreement was examined to determine whether it was "just and reasonable," and whether it comported with the public interest criteria of Section 102 [of the Act].
Brief of Respondent, at 27.

action inherent in a standard that permits an agency to measure fairness and reasonableness in the abstract.

■ In addition to the foregoing, there is another reason why the CAB should be permitted to reject or modify intercompany transactions only in accordance with the "impairment" standard: application of a less rigorous standard would subvert congressionally-imposed limitations on CAB authority. Congress has determined that the CAB can include a condition such as condition 3 in its orders only if the agency finds that condition to be "just and reasonable." Section 408(b), 49 U.S.C. § 1378(b). The basis for the CAB's determination that condition 3 is "just and reasonable" is the ongoing need to ensure that no impairment of FTL's ability to perform its certificate obligations results from coercive or manipulative intercompany transactions. It follows that the CAB, when reviewing a transaction pursuant to condition 3, should not disregard that condition's purpose and reject or modify the proposed transaction solely because, for example, a transaction even more favorable to the carrier is conceivable. To permit such administrative action when there is no reasonable likelihood that the proposed transaction would impair performance of certificate obligations would be tantamount to reading the "just and reasonable" language out of section 408. Accordingly, to preserve the statutory scheme, the purpose of a section 408 condition must be used to define the limits of CAB authority under that condition. In the present case, this analysis reinforces our view that the CAB may reject or modify a proposed transaction pursuant to condition 3 only if that transaction is reasonably likely to impair FTL's ability to perform its certificate obligations.

TI and FTL agree that the CAB may reject or modify a proposed intercompany transaction when necessary to prevent impairment of FTL's certificate obligations. They go a step further, however, and argue that the "impairment" standard limits the CAB to determining whether the transaction treats FTL less fairly than it would be treated as an independent carrier, or places it in a less favorable financial position than it would have enjoyed outside the holding company structure. We reject this contention for two reasons. First, it is conceivable that TI and its subsidiaries, including FTL, could enter into an agreement that would accord FTL the same benefits it would enjoy as an independent company yet which would tend to impair its ability to fulfill its certificate obligations. If and when such a transaction is proposed, the CAB should be free to reject or modify it. Second, the limitation proposed by TI and FTL necessarily requires the CAB to address and answer a hypothetical question: What would FTL's position be had it remained independent? There is simply no way that the CAB and the parties can bring that inquiry down from the realm of speculation—especially as FTL becomes further removed from its independent status. Although "but for" speculation is necessary in some aspects of the law, there is no reason to require the CAB to engage in it in this context.

B

Determining what standard of judicial review governs our evaluation of the CAB's decision is a more difficult task. TI and FTL argue that we must apply a "substantial evidence" standard. In this case, that standard would require us to set aside the 1973 and 1975 Orders if the record, viewed as a whole, did not contain substantial evidence to support a finding that the tax allocation agreement impairs or is reasonably likely to impair FTL's ability to fulfill its certificate obligations.

Both legislation and case law from outside this circuit provide some support for the substantial evidence standard. Section 1006(e) of the Act, 49 U.S.C. § 1486(e), provides in part: "The findings of facts by the Board or Administrator, *if supported by substantial evidence, shall be conclusive.*" (Emphasis added.) The view that this provision admits of no exceptions to the substantial evidence standard is reinforced by section 1005(f) of the Act, 49 U.S.C.

§ 1485(f), which provides in part: "*Every order of the Administrator or the Board shall set forth the findings of fact upon which it is based . . . .*" (Emphasis added.)[17]

Also, some courts have construed the substantial evidence standard of section 1006(e) broadly. For example, in *Pillai v. CAB*, 158 U.S.App.D.C. 239, 485 F.2d 1018 (1973), the District of Columbia Circuit reviewed orders of the CAB extending into the 1973 travel season the International Air Transport Association's 1972 rate agreements covering North Atlantic routes. As in this case, the record from which the orders emanated was sparse and, although this fact is obscure in the opinion, no hearing was held during the course of the proceedings leading to the orders. The record consisted only of the CAB's orders, written justifications submitted by three American air carriers, written comments by an association of supplemental carriers, minutes of a currency conference, and the complaint of a consumer group. Nevertheless, the court applied the substantial evidence standard and ultimately set the orders aside. Citing section 1006(e), the court said:

> To the extent that the Board's "public interest" determination *involved factual predicates,* the substantive statute requires that they be supported by substantial evidence.

*Id.* at 1023, 485 F.2d at 1023 (emphasis added); *see also Railway Express Agency, Inc. v. CAB*, 120 U.S.App.D.C. 228, 345 F.2d 445 (1965).

Notwithstanding this support for such a standard, our evaluation of the procedural history of this case, relevant Supreme Court and Ninth Circuit decisions, and various policy considerations lead us to conclude that the substantial evidence standard should not be applied here. Rather, we will review the CAB's 1973 and 1975 Orders only to determine whether they are arbitrary and capricious.

In *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973), the Supreme Court distinguished between the standard of review which is appropriate where a hearing is held from one where no hearing is held. There, bankers applied to the Comptroller of the Currency for a certificate authorizing them to organize a new bank. They did not request a hearing and the governing statutes did not require one. Agency regulations permitted a hearing at the discretion of the Comptroller only upon request. The Comptroller denied the application. The bankers petitioned for reconsideration but again failed to request a hearing. Again the Comptroller denied their application. A federal district court, on the basis of the administrative record, upheld the Comptroller's decision because "there is substantial basis for his determination, and . . . it was neither capricious nor arbitrary." The court of appeals reversed and remanded, holding that the district court should have held a trial de novo. The Supreme Court disagreed. It first noted that the Comptroller was not required to hold a hearing or to make formal findings on a hearing record when passing on the application for a new bank. The Court then stated: "Accordingly, the proper standard for judicial review of the Comptroller's adjudications is *not* the 'substantial evidence' test which *is* appropriate when reviewing findings made on a hearing record . . . ." *Id.* at 141, 93 S.Ct. at 1243 (emphasis added; citation omitted). While review was pursuant to the Administrative Procedure Act (APA) and not, as

17. The persuasiveness of the view that Congress intended with sections 1005(f) and 1006(e) to provide the exclusive standard of judicial review is substantially diminished by the timing of all relevant congressional action. Sections 1005(f) and 1006(e) date back to the original Civil Aeronautics Act of 1938, Pub.L. No. 706, §§ 1005(f), 1006(e), 52 Stat. 1025. At that time, a hearing was required in *all* cases arising under what is now section 408 of the Act. *See* Civil Aeronautics Act of 1938, Pub.L. No. 706, § 408(b), 52 Stat. 1001. Congress did not provide an exception to the hearings requirement of section 408 until 1960. Act of Sept. 13, 1960, Pub.L. No. 86–758, § 1, 74 Stat. 901, *amending* 49 U.S.C. § 1378(b). The present case arises from administrative proceedings that did not include a hearing, pursuant to the 1960 amendment. See note 18 *infra.*

here, section 1006 of the Act, 49 U.S.C. § 1486, we find it significant that the Court recognized a critical difference between review of a hearing record and review in a case where no hearing is held.

Also, we have already refused to apply the substantial evidence standard to a case brought pursuant to section 1006 of the Act where no administrative hearing had been held. In *Island Airlines, Inc. v. CAB*, 363 F.2d 120 (9th Cir. 1966), an airline petitioned the CAB for an exemption from economic regulation. Various political bodies submitted resolutions supporting the petition, and two competing airlines filed answers in opposition. The petitioning airline neither filed a response to this opposition nor requested a hearing, even though a hearing was available, upon request, at the discretion of the Board. The CAB denied the petition. On review, we noted the "surprising . . . fact that Island did not request a hearing by the CAB on its exemption application, as it [was] authorized to do," *id.* at 124, and proceeded to uphold the CAB's decision under an "arbitrary, capricious or abuse of discretion" standard, *id.* at 125–26.

■ These cases lend support to the proposition that on the facts of this case, an arbitrary and capricious standard is appro-

priate. First, no administrative hearing was held on the application of TI and FTL for approval of the tax allocation agreement. Second, TI and FTL did not request a hearing, either initially or in their petition for rehearing; instead they were satisfied to let the CAB decide the issue on the basis of *their own* (TI's and FTL's) documentation. Third, the CAB was neither statutorily nor constitutionally required to hold a hearing.[18] Finally, no opponent of the proposed tax allocation agreement appeared in the proceedings to present countervailing arguments and evidence.[19]

Sound considerations of policy also support this result. If we were to apply a substantial evidence standard to a case where no hearing was required or requested and where the bulk of the record consists of the petitioner's own documentation in support of its application, the CAB would be placed in an extremely difficult position. It would in all such cases find it necessary to order a hearing sua sponte or otherwise introduce into the administrative record a quantum of evidence contrary to the applicant's position sufficient to preserve the option of ruling against the applicant and of having that ruling sustained on appeal. We do not believe that Congress intended such a strange result when it eliminated the hearing requirement for some cases, includ-

18. TI and FTL do not contend that the CAB was statutorily required to hold a hearing on their application for approval of the tax allocation agreement or on their petition for reconsideration. Indeed, the record here precludes such an argument. In 1960, Congress amended section 408 of the Act, 49 U.S.C. § 1378, to permit the CAB, in certain circumstances and pursuant to certain procedures, to dispense with a hearing in cases arising under that section. Act of Sept. 13, 1960, Pub.L. No. 86–758, § 1, 74 Stat. 901, *amending* 49 U.S.C. § 1378(b). In the proceedings leading to the 1970 Order, the CAB, after fully complying with that amendment, dispensed with a hearing. In that Order, the CAB retained jurisdiction to impose, without a hearing, further conditions. Flying Tiger accepted this provision, along with all others in the Order. Under authority of this provision, the CAB then conducted, without a hearing, the proceedings leading to the 1973 and 1975 Orders.

TI and FTL do argue, however, that the CAB was constitutionally required to afford them a

hearing before entering the 1973 and 1975 Orders. But because they did not make that argument to the CAB, they cannot raise it on appeal. 49 U.S.C. § 1486(e) (second sentence); *Island Airlines, Inc. v. CAB*, 363 F.2d 120, 124 (9th Cir. 1966). We presume, therefore, that the CAB acted within constitutional bounds.

19. Other circuits have applied the substantial evidence standard to cases where no hearing was held but where opponents of the petitioning air carrier's application appeared before the CAB to present countervailing arguments and evidence. *Law Motor Freight, Inc. v. CAB*, 364 F.2d 139 (1st Cir. 1966), *cert. denied*, 387 U.S. 905, 87 S.Ct. 1683, 18 L.Ed.2d 622 (1967); *Nebraska Dept. of Aeronautics v. CAB*, 298 F.2d 286 (8th Cir. 1962). Although these cases may conflict with our decision in *Island Airlines, Inc. v. CAB, supra*, 363 F.2d 120, we see no inconsistency between them and our treatment of the factually distinguishable case presently before us.

ing the one before us, arising under section 408 of the Act.[20]

Accordingly, we hold that we may set aside the 1973 and 1975 Orders only if the decision embodied in them regarding potential impairment of FTL's certificate obligations is arbitrary or capricious.

### C

■ In light of the wide deference required by the "arbitrary and capricious" standard of judicial review, we must affirm the 1973 and 1975 Orders. Those Orders reflect rational decisionmaking and, in particular, a not unreasonable evaluation of the tax allocation agreement's potentially adverse impact on FTL's performance of its certificate obligations. Pursuant to the agreement, FTL would pay to TI the amount of money which would have constituted its tax liability if it were an independent company. The CAB could rationally conclude, that with this agreement in effect, TI management might be able to siphon funds away from FTL in profitable years and, in the process of doing so, withdraw from that subsidiary necessary working capital. Clearly, a continuing program of capital expenditures by FTL is essential if it is to meet its ongoing certificate obli-

gations to the public. Accordingly, the CAB's modification of the agreement may be viewed as an attempt to insure that a proportionate share of the TI group's tax savings be available for future FTL capitalization programs.[21]

Also, the 1973 and 1975 Orders merely give continuing effect to a CAB decision contained in the 1970 Order: FTL may transfer funds to TI *only* in the form of a cash dividend, which in no event can exceed 50% of FTL's net income. (The proposed tax allocation agreement, of course, would have provided a significant alternative means of transferring funds from the subsidiary to the holding company.) The fact that limited payment of dividends is permitted by the CAB tends to reduce, in our view, the chances of successfully demonstrating arbitrariness in the CAB's rejection of the tax allocation agreement as submitted. Also, while FTL is permitted to transfer funds to TI only through payment of cash dividends, this is rationally related to the CAB's valid objective of monitoring closely intercompany transactions within the Tiger group involving FTL.

The CAB's decision regarding the tax allocation agreement perhaps may be subjected to valid criticism. It may well be that

---

**20.** The primary purpose of the 1960 amendment permitting the CAB to dispense with a hearing in *some cases*, see notes 17 & 18 *supra*, was to facilitate CAB disposition of section 408 cases, *not* to hinder that process. *See* H.R.Rep. No.2171, 86th Cong., 2d Sess. (1960), *reprinted at* 1960 U.S.Code Cong. & Ad.News, 3557–60; *Hearings on H.R.7105, H.R.7111 and S.1545 Before Subcomm. of the House Comm. on Interstate & Foreign Commerce*, 86th Cong., 2d. Sess. (1960).

**21.** In fairness to FTL and TI management, it *must* be pointed out that the sparse record before us shows that, if anything, the management of TI has favored FTL over the other subsidiaries. For example, the tax allocation agreement provides that FTL is to receive cash from TI equal to the tax savings on the consolidated return attributable to use of FTL's tax credits and operating losses. The other subsidiaries, however, receive credits from TI which they can redeem only if and when they subsequently have a profitable year. Also, the record reveals that in directing the affairs of the subsidiaries in order to maximize tax savings for the entire group, management assigned

NAC and not FTL the course of highest risk. For the benefit of the entire group, NAC engaged in a massive capital expenditures program and then adopted an accelerated method of depreciation, one resulting in a tax shelter much larger than necessary to accommodate NAC's own profits. With the adoption of that method and rejection of a straight-line method of depreciation, TI and NAC increased the risk of a future NAC tax liability. Also, there is no evidence that TI management has or intends to siphon funds away from FTL while at the same time withholding from that subsidiary necessary working capital. As noted earlier in this opinion, TI currently contemplates using tax savings to meet the capital needs of all its member subsidiaries and to continue the diversification program.

In measuring the bare rationality of the CAB's decision regarding the tax allocation agreement, however, we believe it appropriate to consider that decision in light of *potential* problems within the scope of the CAB's regulatory authority.

the decision is less wise than other alternatives open to the Board. But that is not the question before us. In light of the considerations discussed, we cannot characterize the 1973 and 1975 Orders as arbitrary and capricious. They reflect a not irrational approach to the problem of potential deleterious manipulation of a subsidiary air carrier by its holding company. Because those Orders are reasonably calculated to achieve valid objectives within the scope of the CAB's regulatory authority, we will not set them aside.

AFFIRMED.