**SUBURBAN O'HARE COMMISSION, et al., Petitioners,**

v.

**Elizabeth Hanford DOLE, Secretary of the Department of Transportation, et al., Respondents.**

No. 85–1073.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 27, 1985.

Decided March 13, 1986.

Rehearing and Rehearing En Banc Denied April 3, 1986.

Joseph V. Karaganis, Bell, Boyd & Lloyd, Chicago, Ill., for petitioners.

Michael M. Conway, Hopkins & Sutter, Chicago, Ill., Peter R. Steenland, Jr., Dept. of Justice, Washington, D.C., for respondents.

Before CUMMINGS, Chief Judge, and SWYGERT and ESCHBACH, Senior Circuit Judges.

SWYGERT, Senior Circuit Judge.

This case concerns the proposed expansion of Chicago's O'Hare International Airport. Petitioners are a group of municipalities situated near the O'Hare Airport and organized into the Suburban O'Hare Commission ("Suburban").[1] Respondents are the Department of Transportation, the Federal Aviation Administration ("FAA"), the City of Chicago, and various public officials including the Secretary of the Department of Transportation.

Suburban has petitioned this court to set aside the decision of the FAA approving Chicago's plan to expand the capacity of O'Hare and to enjoin all further construction at the location. For the reasons we now set forth the petition is denied.

I

Located on a 6,925 acre site in Cook and DuPage counties seventeen miles northwest of downtown Chicago, O'Hare is one of three airports owned and operated by the City of Chicago.[2]

During World War II Douglas Aircraft manufactured C–54 transport planes for the United States Air Corps on the site of what is now O'Hare. The City purchased the Douglas facility for one dollar in 1945, and built the Orchard Place Airport on the site in 1946. In 1949 the facility was renamed for Edward "Butch" O'Hare, a Navy fighter ace and Congressional Medal of Honor recipient.

From 1926 to 1959 Midway Airport was the major airport of the Chicago area and the busiest airport in the world, but chronic congestion at Midway led to the City's decision to make O'Hare the area's major airfield. In 1959 the City began a massive expansion of O'Hare. By July 1962 most

---

1. The communities are the Village of Addison, the Village of Bensenville, the City of Des Plaines, the Village of Elk Grove Village, the City of Elmhurst, the Village of Franklin Park, the Village of Harwood Heights, the Village of Itasca, the Village of Niles, the Village of Norridge, the City of Park Ridge, the Village of Schiller Park, and the City of Wood Dale. The combined population of these communities is estimated at 400,000. Lawrence C. Bieneman, a resident of the Village of Bensenville, is also a petitioner in this case.

2. The other airports are Meigs Field and Midway Airport.

major air carriers had shifted operations to O'Hare. O'Hare was designed to accommodate twenty million passengers annually, but currently approximately forty million passengers a year pass through the facility. The airport employs 35,000 people and is one of Chicago's largest employers.

Historically, aviation has been a closely regulated industry. In 1938, when commercial aviation was still in its infancy, Congress enacted the Civil Aeronautics Act. In 1958, in response to rapid and dramatic changes in the nature of aviation, Congress replaced the Civil Aeronautics Act with the Federal Aviation Act, 49 U.S.C. §§ 1301 et seq. (Chapter 20 of Title 49).

In 1946, to encourage the development of airports designed to accommodate interstate and international flights, Congress enacted the Federal Airport Act. This Act was superseded by the Airport and Airway Development Act of 1970. This legislation was in turn replaced by the Airport and Airway Improvement Act of 1982 ("AAIA"), 49 U.S.C. §§ 2201 et seq. (Chapter 31 of Title 49). Both the Federal Aviation Act and the Airport and Airway Improvement Act are administered by the FAA.

The Airport and Airway Development Act of 1970 made federal funds available to certain so-called "hub" cities to engage in a long-range planning process designed to produce an appropriate master plan for regional aviation development. In 1975, with funding provided by the FAA, Chicago hired Landrum & Brown, an aviation consulting firm, to prepare a Master Plan Study for O'Hare.[3] The study represented the first attempt to formulate a systematic plan of growth for O'Hare.

Landrum & Brown's Master Plan Study consists of nineteen volumes comprising thousands of pages and examines various factors relevant to airport development.[4] The consultants originally forecast a maximum unconstrained demand of 1.4 million flight operations in the Chicago area by 1995. Without significant expansion, Chicago's Midway Airport was projected to receive .3 million of those flights. Meigs Field was to receive .1 million flights. The remaining one million flights would somehow have to be accommodated at O'Hare. Landrum & Brown initially concluded that the projected demand could only be met by the construction of two new runways. This result was unacceptable to significant segments of the suburban population living near O'Hare. Conscious of the community opposition to the addition of new runways the City decided to limit the growth of O'Hare, in theory eliminating the need for the new runways until at least 1995. At the same time the City committed itself to accommodate at least a significant portion of the projected growth of the region's commercial aviation demand.

While the Master Plan Study was still in the preparation stage opponents of continued growth at O'Hare took their complaint to the courts. In 1974 then-State Attorney General William Scott sued the FAA in federal district court alleging that the agency had violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq., by adopting a policy of unlimited growth at O'Hare. State of Illinois ex rel. Scott v. Butterfield, No. 74 C 2440 (N.D.Ill.1974). Suburban was permitted to intervene in the litigation. The Butterfield litigation ended on October 15, 1982, when the FAA, the City, and Suburban entered into a consent decree govern-

---

3. The City retained O'Hare Associates as supervising consultants for the project. O'Hare Associates is a joint venture of partners from Murphy-Jahn (architecture), Envirodyne (engineering), and Schal Associates (construction). L & B was the original planner of O'Hare.

4. Using funds provided by the FAA, Suburban retained the consulting firms of Ralph Burke Associates and Bolt, Beranek & Newman, Inc. to furnish an independent review of the L & B MPS. Suburban's consultants gave favorable reviews to the L & B study. "Methodologies used by L & B for [aviation] forecasts and noise analysis are widely used and generally accepted by the airport community and federal agencies." Interim Report on Review of O'Hare Airport Master Plan, MPS Vol. XIX at B-2.

ing future growth at O'Hare. The consent decree provided in relevant part:

¶ 1a. All future development at O'Hare will comply with all then applicable requirements of Federal and State of Illinois laws requiring environmental analyses and processing.

.    .    .    .    .

¶ 1d. Chicago agrees that it will request the FAA to process an Environmental Impact Statement ("EIS") ... with respect to any of the following projects (or projects similar in scale or purpose) at O'Hare: (i) Terminal 1 and related concourses and aprons; (ii) International Terminal; (iii) general aviation terminal; (iv) commuter concourse; (v) new air cargo facilities; (vi) construction of military replacement facilities; (vii) runway extensions. The FAA agrees that an environmental impact statement with respect to these projects will be processed to the extent the above projects fall within its jurisdiction. Chicago further agrees that it will not proceed with the construction of any or all of the projects listed in this paragraph 1d until an EIS is completed.

.    .    .    .    .

¶ 1f. Chicago agrees that the entire Master Plan development for O'Hare, including the projects identified in paragraph 1d above, will be presented to the FAA for Airport Layout Plan approval and the related environmental review as a single, comprehensive submission. Chicago agrees that the environmental assessment which it provides to the FAA and the public in connection with these projects will assess the impact of these

projects on the assumption that the High Density Airports Rule will have been repealed.

¶ 1g. The FAA has not made any determination with respect to the matters described in Paragraphs 1e or 1f above, and this Decree does not bind the FAA with regard to any determination it may make respecting these matters.

The consent decree required the City to submit its airport development plans to the FAA in a single, comprehensive Airport Layout Plan, comporting with all relevant environmental provisions. The consent decree also formalized community involvement by establishing the O'Hare Advisory Committee, composed of representatives from both the community and government, as the appropriate forum for consideration of the relationship between O'Hare and its surrounding communities.[5] The consent decree further provided for the establishment of a permanent Office of Noise Abatement charged with investigating complaints about airport noise and with evaluating the effectiveness of noise abatement procedures.

The parties to the consent decree entered into a separate Intergovernmental Agreement which provided that the communities surrounding O'Hare would take "feasible and reasonable steps to discourage the further development of incompatible land uses around O'Hare." In return, the City agreed that it would employ a specified analytic model in measuring the impact on noise levels of O'Hare operations and that the resulting "noise map" prepared by the City would be based on a 65 Ldn Contour.[6]

5. Representation on the Advisory Committee was distributed as follows:

DuPage Mayors and Managers Conference (2)
North Central Council of Mayors (2)
North West Municipal Conference (2)
Suburban O'Hare Commission (1)
Cook County Board of Commissioners (1)
DuPage County Board of Commissions (1)
Chicago Association of Commerce and Industry (1)
Air Transport Association (1)
Federal Aviation Administration (1)
Northeastern Illinois Planning Commission (1)

Illinois Department of Commerce and Community Affairs (1)
Illinois Department of Transportation (1)
Chicago Department of Aviation (1)
Office of the Mayor, City of Chicago (1)

6. The 65 Ldn contour delineates the area within which aircraft noise exceeds 65 decibels, as measured on the Day-Night Average Sound Level scale. That scale reflects the number, duration, and intensity of noise "events." The Ldn scale weighs night-time noise ten times as heavily as the same absolute amount of day-time noise, reflecting the fact that people perceive noise as more intrusive during the night.

Chicago represented that it would not seek a finding of no significant environmental impact by the FAA.

After the signing of the consent decree the City continued to review its plans for redevelopment of O'Hare. The O'Hare Master Plan originally called for a three-phase development schedule.[7] As a result of the *Butterfield* litigation the City adopted a two-phase development plan. Phase I of the two-phase plan primarily involved the construction of a fourth terminal and an associated Concourse L. Phase II is a much more ambitious undertaking. According to the notice of intent published on November 26, 1982 in the Federal Register, the following projects are contemplated:

Extension of Runways 27R, 32L

Construction of second taxiway bridge

Construction of new taxiways

Relocation of the inner/outer terminal area taxiway

New apron construction

Construction of snow removal facilities

Acquisition of the military site and demolition and replacement of existing USAF facilities

Construction of a new International Terminal and Concourse

Expansion of existing terminal buildings

Construction of a new Terminal 1 and new concourses B/C

Construction of a new general aviation facility

Construction of new cargo complex

Expansion of the heating and refrigeration plant

Terminal area roadway improvements

Airport ground access improvements

Construction of a new post office facility

People mover systems

Parking facilities

The official estimated cost of all the development projects is $840 million, Rec.Vol. I, at 1028, but the record is replete with much higher estimates and petitioners have placed the total cost at approximately $1.5 billion. Less than five percent of the development is to be federally financed. Most of the funding will come from General Airport Revenue Bonds issued by the City, Rec.Vol. I, at 30. Those bonds will be repaid by fees and charges imposed on airlines using O'Hare.

Public hearings were held on the matter in December 1982. The City began receiving written comments concerning the proposed development plans soon thereafter. Suburban, for instance, submitted written comments on January 11, 1983, Rec.Vol. I, at 173. Typically, the written comments raised questions about the impact on the environment of the proposed expansion plans.

II

NEPA mandates that federal agencies undertaking "major federal actions significantly affecting the quality of the human environment" must submit an Environmental Impact Statement ("EIS"). It is not contested that the City has requested and will receive at least $43 million in federal funding bringing the expansion plans for O'Hare within NEPA's ambit. An EIS must provide a "detailed statement" on:

(1) the environmental impact of the proposed action,

(2) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(3) alternatives to the proposed action,

(4) the relationship between local short-term uses of man's environment and the maintenance and enhancements of long-term productivity, and

(5) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. 42 U.S.C. § 4332(2)(C).

FAA Order 5050.4 states that an Airport EIS should consider the following:

---

7. Phase I was to begin in 1982–83; Phase II included development in 1983–87; and Phase III covered all development past 1987.

Purpose and Need for the Action

Alternative

Affected Environment

Environmental Consequences

Noise

Land use

Social impacts

Induced socio-economic impacts

Air quality

Water quality

DOT Section 4(f) lands

Historic sites

Biotic communities

Design, art and architectural applications

Endangered species of flora and fauna

Wetlands

Floodplains

Prime and unique farmlands

Energy

Light emissions

Solid waste

Construction Impacts

Adverse Impacts which Cannot be Avoided

The City determined that "Noise, Land use, Water quality, Air quality, and Construction impacts" should receive the greatest attention in the O'Hare EIS, Rec.Vol. I, at 141. The EIS in this case was prepared in stages and reflects the contributions of many individuals and organizations including the petitioners. A preliminary draft of the EIS, prepared by the City, was completed by February 1983; a formal draft of the EIS, was submitted in June 1983. The final EIS processed by the FAA using data furnished by the City was completed in May 1984. Because the environmental issues raised by the O'Hare expansion plans had always been the most controversial element of the Airport Layout Plan, FAA completion of the final EIS cleared the way for approval of the Plan, which came on November 14, 1984.[8] In July 1984 in response to comments from the Environmental Protection Agency the FAA developed a program of air quality mitigation measures.

On December 4, 1984 Suburban filed suit in the United States District Court for the Northern District of Illinois against the FAA and the City alleging that the approval of the Airport Layout Plan violated the *Butterfield* consent decree, NEPA, the Airway and Airport Improvement Act, and the Clean Air Act, 42 U.S.C. §§ 7401 *et seq.* Suburban moved for a preliminary injunction to enjoin all further construction at O'Hare. The district court dismissed the complaint finding that it lacked subject matter jurisdiction over the complaint. *Suburban O'Hare Commission v. Dole,* 603 F.Supp. 1013, Memorandum Opinion and Order (N.D.Ill.1985). Prior to the district court's dismissal, Suburban, as a matter of protective pleading, filed the present petition for review in this court on January 14, 1984. It is that petition for review that is before us. Technically, the petition for review asks us only to review the legality of the FAA's approval of the Airport Layout Plan. As we have indicated, however, the Plan incorporates by reference all relevant environmental requirements. In effect, therefore, we are also asked to rule upon the adequacy of the final EIS.

### III

A threshold issue we must address before reaching the merits of Suburban's claim is whether jurisdiction properly vests in this court, as respondents contend, or in the district court, as petitioners urge. We

---

**8.** A cost-benefit analysis is not required of an EIS, but one was prepared in this case although it was not included in the final EIS. Master Plan Study, Vol. XI, at V–2. Under the Council on Environmental Quality's regulations governing the implementation of NEPA, an EIS need not include a formal cost-benefit analysis. 40 C.F.R. § 1507.23. "The statement is sufficient if it gives the decisionmaker and other readers enough detail concerning all of these costs and benefits to permit reasoned evaluation and decision." *South Louisiana Environmental Council v. Sand,* 629 F.2d 1005, 1013, n. 7 (5th Cir.1980); *Sierra Club v. Sigler,* 695 F.2d 957, 976–77, n. 15 (5th Cir.1983). A formal cost-benefit analysis need be included in the EIS itself only if the agency relies on such analysis in reaching the decision to which the EIS relates. 40 C.F.R. § 1510.23.

have been assisted in our consideration of this matter by the thoughtful opinion of the district court dismissing Suburban's complaint. We point out, however, that the proceeding below is jurisdictionally distinct from the present petition for review in this court and that the district court's decision is not under review by this court.

The FAA has stated that its review of the Master Plan Study and Airport Layout Plan was conducted under parts 77, 139, 152, and 157 of FAA regulations codified at 14 C.F.R. The FAA's review pursuant to 14 C.F.R., parts 77, 139, and 157, was conducted pursuant to authority vested in the FAA's review pursuant to part 152 of 14 C.F.R. was conducted pursuant to authority of Chapter 31 of Title 49.

49 U.S.C. § 1486(a) provides that:

(a) Any order, affirmative or negative, issued by the Board or Administrator under this chapter, except any order in respect of any foreign air carrier subject to the approval of the President as provided in section 1461 of this title, shall be subject to review by the court of appeals of the United States or the United States Court of Appeals for the District of Columbia upon petition, filed within sixty days after the entry of such order, by any person disclosing a substantial interest in such order. After the expiration of said sixty days a petition may be filed only by leave of court upon a showing of reasonable grounds for failure to file the petition theretofore.

49 U.S.C. § 1486(d) declares that the courts of appeals shall have exclusive jurisdiction to affirm or set aside an order of the FAA issued pursuant to this section. Thus, if the FAA order approving the ALP was, in fact, made pursuant to Section 1486 it is clear that exclusive jurisdiction to review that order rests with this court. *Gaunce v. deVincentis*, 708 F.2d 1290 (7th Cir.1983); *City of Aurora v. Hunt*, 749 F.2d 1457 (10th Cir.1984); *City of Alexandria v. Helms*, 728 F.2d 643 (4th Cir.1984); *State of New York v. FAA*, 712 F.2d 806 (2d Cir.1983); *City of Rochester v. Bond*, 603 F.2d 927 (D.C.Cir.1979).

Suburban advances three arguments in support of its contention that the FAA's order of November 14, 1984 is reviewable only in the district court. First, Suburban contends that the FAA's decision was actually made pursuant to Chapter 31 of Title 49. Second, Suburban asserts that the district court had jurisdiction over its claim by virtue of the *Butterfield* consent decree. Third, Suburban argues that the FAA decision is not an "order" for purposes of Section 1486 because the administrative record is based on disputed issues of fact subject to the general jurisdictional grant of 28 U.S.C. § 1331.

■ Of the four "orders" entered by the FAA as part of its November 14, 1984 decision, three were issued on the purported authority of Chapter 20 of Title 49. One order was issued on the authority of Chapter 31. When an agency decision has two distinct bases, one of which provides for exclusive jurisdiction in the courts of appeals, the entire decision is reviewable exclusively in the appellate court. In *Gaunce*, 708 F.2d 1290, for example, a pilot challenged the FAA's order revoking her flight certificate. The challenge was based on both the Federal Aviation Act and the United States Constitution. The court nonetheless held that exclusive jurisdiction rested in the court of appeals.

■ To permit Suburban to maintain this action in the United States district court would contravene the clear intention of Congress that agency decisions made under Chapter 20 be reviewed by the courts of appeals. The separation of Chapter 20 claims from Chapter 31 claims in this case could only be effectuated through bifurcated proceedings. But the purpose of having agency decisions reviewed by courts of appeals is to avoid duplicative factfinding. If there is any ambiguity as to whether jurisdiction lies with a district court or with a court of appeals we must resolve that ambiguity in favor of review by a court of appeals. If a decision of an administrative agency is based, in substantial part, on a statutory provision providing for exclusive review by a court of appeals, then the

entire proceeding must be reviewed by a court of appeals. We need not reach the question of what constitutes "substantial part" where, as here, three of the four orders in question were issued under 49 U.S.C. § 1486. In the absence of a clear indication that an alternative basis of jurisdiction was intended, we must presume that Section 1486 (Chapter 20) applies.

■ Although a violation of a consent decree is primarily a breach of contractual obligations, federal courts, both trial and appellate, may enforce such decrees under the doctrine of ancillary federal jurisdiction. The interpretation of a consent decree is a matter of law and subject to plenary review on appeal. *United States v. Board of Education of City of Chicago*, 717 F.2d 378, 382 (7th Cir.1983).[9]

We do not question the inherent authority of district courts to enforce settlement agreements terminating litigation pending before them, *see McCall-Bey v. Franzen*, 777 F.2d 1178 (7th Cir.1985), but it is not clear that the consent decree in this case creates unfulfilled substantive obligations on the part of the City and the FAA. The parties to the *Butterfield* litigation agreed to a particular procedural format, that is, a specific method of dispute resolution. The FAA and the City have complied with the terms of the consent decree, and a motion to enforce the consent decree in the district court, at this stage of the proceedings, would serve no useful purpose.

To a certain extent the jurisdictional problem posed by this case is one of characterization. The FAA need not have characterized its decision as one made pursuant to its authority under Section 1486. It might have issued its order under the authority of the Airport and Airway Improvement Act. But since the FAA chose to rely on Section 1486, petitioners are effectively foreclosed from pursuing their claims in the district court. Congress has not provided us with a mechanism for determining whether a decision by the FAA to characterize its

order as one made under Section 1486 is genuine or not.

■ Suburban lastly contends that jurisdiction does not properly lie with this court because there are disputed issues of fact regarding the scope and the content of the administrative record which must be resolved in the district court. The asserted gross inadequacy of the administrative record, Suburban contends, suggests that the November 14 decision is not an "order" for purposes of Section 1486. We have previously stated that Section 1486 dictates a broad construction of what constitutes an "order." *Sima Products v. McLucas*, 612 F.2d 309, 312–14 (7th Cir.), *cert. denied*, 446 U.S. 908, 100 S.Ct. 1834, 64 L.Ed.2d 260 (1980). *See also State of New York v. FAA*, 712 F.2d at 808. The existence of a reviewable administrative record is the determinative element in defining an FAA decision as an "order" for purposes of Section 1486. *City of Alexandria*, 728 F.2d at 646. "If the FAA's record were inadequate to permit review directly in the court of appeals, we would be inclined to find that the action, although final, is not an order within the meaning of [Section 1486]. However, we are not presented with that situation here." *Sima Products*, 612 F.2d at 314 (citations omitted).

Suburban argues that if this court exercises jurisdiction over the petition for review it must apply the judicial review provisions of the Administrative Orders Review Act (the Hobbs Act), 28 U.S.C. § 2347(b). That Act provides that where the agency is not required to hold a hearing and has, in fact, not held a formal hearing, and when the pleadings present genuine issues of material fact, the case must be sent to the district court for a trial *de novo*. 28 U.S.C. § 2347(b)(3).

This is a novel argument. No reported case has applied the Hobbs Act to FAA final orders. There is no indication that Congress intended the Act to apply to any

---

9. Suburban did not file a motion to enforce the consent decree. Instead, it filed an entirely new complaint. Suburban argued that it had been misled by the clerk of the district court into filing a new claim. That allegation was rejected by the district court.

agency other than the five enumerated in the statute. There is ample evidence indicating that Congress intended for decisions of the FAA to be reviewed solely under Section 1486.

## IV

■ Before turning to the merits of this case we must also announce our standard of review of FAA decisions. Section 1486 provides that "findings of fact" by the FAA "if supported by substantial evidence, shall be conclusive." In this case no formal hearings were conducted by the agency. Instead, the FAA received written submissions and conducted numerous nonadversary, informal proceedings. Two circuits have held that appellate review of informal agency action under Section 1486 is governed by an "arbitrary and capricious" standard of review. *Rombough v. FAA*, 594 F.2d 893, 896 (2d Cir.1979); *Tiger International v. CAB*, 554 F.2d 926, 935–36 (9th Cir.), *cert. denied*, 434 U.S. 975, 98 S.Ct. 532, 54 L.Ed.2d 467 (1977). In *Starr v. FAA*, 589 F.2d 307, 310 (7th Cir.1978), this court appeared to apply an abuse of discretion standard to review of informal FAA action under Section 1486. In *Aircraft Owners & Pilots Assoc. v. FAA*, 600 F.2d 965, 969–72 & n. 28 (D.C.Cir.1979), however, the court held that informal FAA action made on the authority of Section 1486 should not be overturned unless it is unsupported by substantial evidence. Similarly, in *State of South Dakota v. CAB*, 740 F.2d 619, 621 (8th Cir.1984), the court held that a Civil Aeronautics Board decision under Section 1486 "based upon factual consideration drawn from an informal, nonadversarial record consisting of information and comments submitted by opposing sides and interested parties" should be reviewed under a substantial evidence standard. We agree with the Eighth Circuit and District of Columbia Circuit that the substantial evidence test is the appropriate standard of review of FAA action under Section 1486. The fact that the agency findings in this case were the product of an informal information-gathering process does not affect our standard of review.

Congress has indicated that the substantial evidence test is the proper standard for all FAA decisions under Section 1486. *See also White Industries v. FAA*, 692 F.2d 532 (8th Cir.1982); *Pillai v. CAB*, 485 F.2d 1018, 1023 (D.C.Cir.1973) (applying substantial evidence standard); *Law Motor Freight v. CAB*, 364 F.2d 139, 144 (1st Cir.1966).

*Rombough, Tiger International,* and *Starr* were proceedings requesting exemptions from a valid agency rule. Those cases relied heavily on *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973), which distinguished between the standard of review under the Administrative Procedure Act ("APA") of agency action taken after a formal hearing and agency action taken without a formal hearing. Under the APA the substantial evidence test is only appropriate when reviewing findings made on a hearing record. 5 U.S.C. § 706(2)(E); *Camp*, 411 U.S. at 141, 93 S.Ct. at 1243. The appropriate standard of review of informal agency action under the APA is whether the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Camp*, 411 U.S. at 142, 93 S.Ct. at 1244. The obvious difficulty with the rationale of those cases reviewing informal FAA decisions under the "arbitrary and capricious" or "abuse of discretion" standards is that the APA is clearly not applicable to FAA action under Section 1486. Both *Tiger International*, 554 F.2d at 935–36, and *Rombough*, 594 F.2d at 896, acknowledge that their reliance on *Camp* and the APA is by analogy only. But the argument by analogy is neither persuasive nor necessary where, as here, Congress has created a special review provision specifically designed to address precisely the type of case before the court. The specific review provisions of Section 1486 take precedence over the general provisions of the APA. *Rombough*, 594 F.2d at 895–96.

In addition, we note that *Tiger International, Rombough,* and *Starr* all involved requests for exemptions from valid agency rules. All three courts were concerned

with the administrative and practical difficulties of applying a substantial evidence test to a petition for exemption. In *Starr*, for example, the court noted that:

> In proceedings requesting exemptions from a valid agency rule ... the bulk of evidence is petitioner's, since he must show that circumstances justify an exemption in his case. And if an agency's decision to grant or deny an exemption were to be judged under a substantial evidence rule, that agency would be forced to defend its standard rule in every exemption proceeding.

589 F.2d at 311. In the instant case these concerns are nonexistent. The FAA in this case is not articulating a standard rule and the bulk of the evidence is not petitioners'. We note that the facts in *Aircraft Owners & Pilots Association* and *State of South Dakota v. CAB*, like those in this case, also involved FAA approval of a specific construction project.

In *Association of Bank Travel Bureaus v. Board of Governors*, 568 F.2d 549 (7th Cir.1978), this court was called upon to determine the applicable standard of review of decisions of the Board of Governors of the Federal Reserve System under 12 U.S.C. § 1848 which, like 49 U.S.C. § 1486, provides for exclusive review in the courts of appeals and states that administrative findings shall be conclusive if supported by "substantial evidence." The court held, however, that where the board engaged in rulemaking "which did not involve findings required by statute to be made or the record after opportunity for an agency hearing," 568 F.2d at 552, the "arbitrary and capricious" standard is the proper standard of review.

*Association of Bank Travel Bureaus* does not control this case. Aside from the obvious distinction that this earlier case involved the interpretation of a different statute, the decisionmaking processes of the FAA in this case are sufficiently unlike the decisions of the Board of Governors in *Association of Bank Travel Bureaus* to warrant our invocation of a substantial evidence rule. The "informality" of the FAA decisionmaking process is less important to our decision than the fact that petitioner's views were represented at virtually every stage of the decisionmaking process. The arbitrary and capricious standard of the APA is designed to protect agency decisions made without the benefit of a complete record compiled in an adversarial or quasi-adversarial proceeding. The lengthy and elaborate decisionmaking procedures preceding the FAA's November 14 decision in this case are not the sort of informal processes the drafters of the APA had in mind when they adopted the arbitrary and capricious standard of review.

We realize that our decision appears to conflict with *Tiger International* or *Rombough* or *Starr*, "but we see no inconsistency between them and our treatment of the factually distinguishable case presently before us." *Tiger International*, 554 F.2d at 936, n. 19. In the absence of any other direction from Congress and in the absence of the special concerns evident in the facts of those cases, we must apply the plain language of Section 1486.

### V

Having concluded that jurisdiction properly lies with this court and having clarified the standard of review we turn finally to the merits of the petitioners' claims. The FAA Record of Decision reports that the EIS submitted by the City and approved by the agency considered five alternatives to the proposed development: (a) alternative modes of travel; (b) utilization of other airports; (c) development of a new airport; (d) alternative levels of aviation demand; or (e) do nothing. The City rejected the possibility that alternative modes of travel such as rail, bus, or automobile could satisfy the needs of the majority of travelers. The City also rejected the option of doing nothing because inaction would decrease the efficiency of flight operations while simultaneously increasing the level of noise and air pollution. Suburban does not dispute either of these conclusions. In addition, the City and Suburban agree that there must be some external

limits imposed on the level of aviation demand at O'Hare. They disagree, however, where those limits should be set and on whether the proposed development plan represents an adequate limitation on growth of O'Hare flight operation demand.

The primary area over which the petitioners disagree with the City and the FAA is the adequacy of the respondents' consideration of the possibility of utilizing other airports or constructing a new airport in order to alleviate some of the demands on O'Hare. The discussion of these alternatives in the FAA Record of Decision is brief.

*Utilization of Other Airports.* The only airport that currently provides commercial air carrier service to the Chicago Metropolitan Area is Midway Airport which is being improved to accommodate a limited increase in service to selected cities, but cannot be adequately expanded to handle the increased demand and needs of the Chicago Metropolitan Area. The Greater Rockford Airport and General Mitchell Field in Milwaukee are too distant for most Chicago area travelers and are not suitable alternatives.

*Development of New Airport.* Development of a new major air carrier airport was considered several times in the past, as well as in the recently completed Master Plan Study. This alternative was not selected because of difficulties in finding a suitable site, and the long lead time to make it operational. Development of another air carrier airport to serve the Chicago Metropolitan Area will be studied again as part of a State System Plan to be prepared by the Illinois Department of Transportation under a series of grants to be funded by the FAA's Airport Improvement Program. The initial grant was issued in September 1984.

Petitioners allege that these terse statements are completely inadequate and unsupported by substantial evidence. The Record of Decision, however, represents merely a summation of a voluminous, multi-year inquiry into the proposed development plan. The Record of Decision incorporates by reference the years of planning that preceded it. Our task as an appellate court is to determine whether the FAA's decision was based on substantial evidence, and the evidence we must evaluate consists of the entire administrative record. Of course, the size of the record is not the determinative factor, but rather its comprehensiveness and the inherent reasonableness of the ultimate determination.

Petitioners point out that perhaps half of the airline passengers flying into O'Hare arrive merely to transfer onto another flight taking them to their final destination. They suggest that these transfer passengers could somehow be shifted to other airports obviating the need for new construction at O'Hare.

Petitioners' argument presupposes that the City has some degree of control over transfer passengers. But no effective means of separating those passengers who intend to stay in Chicago for more than a few hours or days from those who are merely passing through has been suggested. O'Hare is the busiest airport in the world because airlines and air travelers find O'Hare to be the most convenient or necessary place to travel to and away from and to make transfers to connecting flights. Moving air traffic to Milwaukee or Rockford or anywhere else is simply not within the power of the City to accomplish. The decision to make O'Hare, or any other airport, a "hub" airport belongs to the airlines and not to the Government. The City could consciously choose to do nothing about conditions at O'Hare and permit the congestion and delays to reach such an intolerable level that airlines would be forced to send flights to other cities. But the City cannot direct the resulting overflow to any particular location. Nor is there any guarantee that the shift away from O'Hare would occur quickly or without massive inconvenience to air travelers. In addition, no one has calculated the impact of a significant increase in flight operations in the airports receiving flights that once went to O'Hare or the damage to the environment of the communities surrounding those airports; such calculations are

not required by federal law. Moreover, the City has already opted for a limited growth option forebearing to build any new runways until 1995. Shifting flight operations might have merit ideally, but a decision by the FAA that such a shift is not possible or practical is amply supported by the record.

A shift of flight operations to Chicago-owned Midway Airport raises fewer of the problems that shifts to other airports in other cities do. Several cities already have two major airports. New York, for instance, has both LaGuardia and Kennedy. But Midway has even less available space than O'Hare and is situated in an area as densely populated as the area around O'Hare. Upgrading Midway to the point that it would eliminate the need to expand O'Hare would entail enormous costs. Moreover, the City has already proposed to add significantly to Midway's capacity.

Another possible solution to the problem of congestion at O'Hare is to construct an entirely new airport. Just as O'Hare replaced Midway as the primary airport in the area, a new airport could replace O'Hare as the principal air travel facility. There are obvious difficulties with this idea. This new airport will presumably have to be at least as large as O'Hare. This means that a site with more than seven thousand acres of undeveloped land will have to be acquired. This land will have to be reasonably close to the central city in order to make commuting acceptable. But Chicago is literally surrounded by sprawling and populous suburbs. Locating thousands of acres of underutilized land would be no easy task. In addition, the building of a new airport would be the most expensive of all possible solutions to the O'Hare problem. A new airport would require years to construct and would have a difficult time passing environmental requirements. Moreover, the City and the FAA are already in the midst of a formal

study of the possibility of building a new airport in the Chicago area. A new airport may or may not be the best long-term solution to the problems of airport travel in and out of Chicago, but the City and the FAA needed to formulate a plan to deal with the short-term problems at O'Hare. The proposed development represents a reasonable response to those problems though one unable to satisfy everyone affected.[10]

Apart from objections to the FAA's consideration of alternatives, Suburban challenges the treatment of the substantive environmental requirements of both NEPA and the Clean Air Act. Those challenges can be characterized as criticisms of the methodology employed by the FAA in measuring projected increases in noise levels and decreases in air quality. Suburban, for instance, quarrels with the FAA's decision to calculate the noise impact of the proposed development on the basis of the relatively quieter jets now being introduced into commercial aviation service. But this particular decision of the FAA appears to us to be reasonable. Moreover, "[i]t is clearly within the expertise and discretion of the [FAA] to determine proper testing methods." *Sierra Club v. United States Dep't of Transportation*, 753 F.2d 120, 128 (D.C.Cir.1985). Suburban's objections to the methodology and conclusions of the FAA's procedures do not begin to establish that those procedures were not based on substantial evidence.

Suburban also alleges that FAA approval of the Airport Layout Plan violates section 176(c) of the Clean Air Act, 42 U.S.C. § 7506(c). Under the Clean Air Act the EPA is required to establish national ambient air quality standards. 42 U.S.C. § 7409. Each state must develop its own implementation plan designed to achieve the national air quality standards. 42 U.S.C. § 7410. Private citizens may bring

---

**10.** Two previous studies of proposals for a third airport have been undertaken. One study examined the possibility of constructing a new airport on landfill in Lake Michigan. Another study considered the possibility of building a new airport in northeast Indiana. Both studies were made available to the FAA and the City. A legislative task force was recently appointed to examine the environmental consequences of further expansion at O'Hare and the feasibility of constructing a new airport.

suit only for violations of the state plans and not the national standards. 42 U.S.C. § 7604. *See Council of Commuter Organizations v. Metropolitan Transportation Authority*, 683 F.2d 663 (2d Cir.1982). The FAA found that the Plan will not violate the Illinois implementation plan. Rec.Vol. VI, at 1679–80. Moreover, the FAA approved the ALP subject to the City's agreement to take steps to mitigate the impact on air quality. The City's compliance with this condition will be monitored by the FAA, the EPA, and the Illinois EPA. Rec. Vol. IV, at 1731–33. Under these circumstances we do not find that a violation of the Clean Air Act has occurred.

We do not suggest that our brief discussion of the difficult choices confronting the City and the FAA represents an exhaustive inquiry into the data, methodology, and calculations of the planners of the O'Hare expansion. But neither is such an inquiry required.

> NEPA does set forth significant substantive goals for the Nation, but its mandate to the agencies is essentially procedural.... It is to insure a fully informed and well-considered decision, not necessarily a decision the judges of the Court of Appeals ... would have reached had they been members of the decision-making unit of the agency. Administrative decisions should be set aside in this context, as in every other, only for substantial procedural or substantive reasons as mandated by statute, ... not simply because the court is unhappy with the result reached.

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978).

It is axiomatic that reviewing courts should not substitute their judgments for those of an agency as to the environmental consequences of its actions. *Kleppe v. Sierra Club*, 427 U.S. 390, 410, n. 21, 96 S.Ct. 2718, 2730, n. 21, 49 L.Ed.2d 576 (1976). Our role is to ensure that the FAA has taken a "hard look" at the environmental consequences of its action. *Id.* "A review-ing court determining whether the factual findings of the agency are based on substantial evidence weighs the evidence in the record supporting the decision against that which is contradictory. As long as sufficient evidence exists that a reasonable mind might accept as adequate to support a conclusion, the agency's findings must be upheld." *Aircraft Owners & Pilots Ass'n*, 600 F.2d at 970 (citations omitted). When measured against this deferential standard, the FAA's decision to approve the Airport Layout Plan was clearly reasonable and clearly supported by substantial evidence.

Suburban alleges that the City and the FAA have kept "two sets of books" regarding the Master Plan decision-making process. The key element of the Master Plan is the twenty-year forecast of "metropolitan aircraft operations demand." Prior to the settlement of the *Butterfield* litigation in 1982 the City forecast an operations demand for the entire Chicago area of 943,000 flights for 1980; 1,064,500 flights for 1985; 1,234,500 flights for 1990; and 1,412,000 flights for 1995. Those estimates were based on 853,000 actual flights in 1974. O'Hare's capacity was estimated at 950,900 flights. Petitioners refer to this data as "the first set of books."

In 1983 the twenty-year metropolitan forecast was revised and this revision was employed in the final EIS and the FAA's Record of Decision. The 1983 revised forecast estimated O'Hare's capacity at 840,960 operations. The City estimates that the completion of Phase II will enable O'Hare to handle 920,000 annual operations in 1995. Without the project the City estimates 840,900 operations would occur in 1995. Petitioners refer to this revised forecast as "the second set of books." In essence, Suburban contends that this alleged second set of books was invented by the City in order to conceal the deficiencies in the Master Plan made evident by the alleged "first set of books." Specifically, petitioners contend that "data, methodologies and calculations" for several key elements of the "second set of books" are "missing."

We confess to being somewhat mystified by Suburban's argument. There is nothing missing from the administrative record. All the "data, methodologies and calculations" of the "first set of books" can be found in the MPS. In fact, petitioners' brief cites to the appropriate sections of that study in its brief identifying the key elements of the "first set of books."

Suburban attempts to drive an artificial wedge between the so-called first and second set of books—a wedge presumably created by the improper desire of the City to mislead petitioners. But it appears far more likely that the 1983 revised estimate of O'Hare's capacity was the result of a tardy recognition on the part of the City that a policy of unlimited expansion at O'Hare was not politically feasible nor environmentally wise. The *Butterfield* litigation and the activities of petitioners were no doubt instrumental in this realization. The FAA's Record of Decision notes that: "The City of Chicago decided to pursue a constrained development for O'Hare that would limit the future growth to that which could be handled by the existing runways and available land and by assuming improved air traffic control capabilities to accommodate increased operations." The FAA's approval of the Airport Layout Plan is clearly predicated on the City's decision not to add new runways to O'Hare. New runway construction would entail a new environmental review. It is obvious that Suburban simply does not believe that the City intends to keep its word. But the City has represented to this court and to the FAA that it has no plans to build any new runways at O'Hare. Neither the FAA nor this court is in a position to gauge the sincerity of the City's promises. Chicago has gone on record and if it breaks its promises, it will certainly find itself again in court.

Suburban also alleges that the FAA's November 14, 1984 Record of Decision violates the Airport and Airway Improvement Act. We agree with the district court that contrary to respondents' contentions the Act applies to the O'Hare expansion plans. But Suburban has not established a violation of that Act.

█ The Airport and Airway Improvement Act requires an airport construction project receiving federal funds to be "reasonably consistent" with existing development plans for the area surrounding the airport. 49 U.S.C. § 2208(b)(1)(A). The final EIS evidences great concern for the impact of the proposed development on the surrounding communities. The entire decisionmaking process in this case belies the contention that the FAA has ignored the development concerns of the area around O'Hare. We point out that the Northeastern Illinois Planning Commission, a state agency overseeing planning for the area of the State in which O'Hare is located, concluded that the proposed project was "consistent with plans and policies of the Commission." M.P.S., Vol. XVI, at B–17.

█ Suburban also contends that the FAA was required by the Airport and Airway Improvement Act to obtain a governor's certificate before approving the Airport Layout Plan. 49 U.S.C. § 2208(b)(7)(A) provides that no application for federal funds for "a project involving airport location, a *major* runway extension, or runway location" shall be approved unless the governor of the state in which the project is located certifies that there is a "reasonable assurance" that the project will comply with applicable air and water quality standards.

Suburban contends that the Airport Layout Plan contemplates two "major runway extensions." Runway 27R and runway 32L are, in fact, to be extended under Phase II of the project. The FAA, however, contends that these are not "major" extensions for purposes of the Airport and Airway Improvement Act. FAA Order 5050.4 defines a major extension as one that will permit the accommodation of aircraft three decibels louder than those currently using the runway. The FAA has determined that the proposed runway extensions will account for only a one decibel

increase. "An agency's interpretation of the statute it must administer is ordinarily accorded great deference." *Illinois Commerce Commission v. ICC*, 749 F.2d 875, 880 (D.C.Cir.1984). We cannot say that the FAA's determination that the runway extensions contemplated by the ALP are not "major" is unreasonable.[11]

Finally, we feel compelled to address the equities of this case. Petitioners conceive of themselves as the innocent, passive victims of a relentlessly expansive O'Hare. They point out that many of the communities surrounding O'Hare were established long before the airport had been built. In all fairness, however, these same communities receive enormous economic benefits from their proximity to O'Hare. Moreover, many of these communities have resisted attempts by the City to harmonize their own land-use regulations with the aviation activity at O'Hare. In a perfect world, petitioners would be able to reap the benefits of their location and still be able to sleep without noise disturbances at night. Unfortunately, the FAA and the City are forced to operate in a world where even their most carefully considered decisions are likely to adversely affect some people. We are confident that the proposed development represents an honest and careful attempt to minimize those consequences and to accommodate the conflicting interests in the best possible manner.

---

11. In view of our disposition of the petition, we need not consider whether an injunction would have been an appropriate remedy in this case had petitioners been entitled to some relief. Nor need we consider respondents' motion to strike petitioners' affidavits. We have considered Suburban's remaining arguments and find them to be without merit.