March 31, 1993
 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT
 

No. 92-1550
No. 92-1638

 CONSUMER ADVISORY BOARD, ET AL.,

 Plaintiffs, Appellants,

 v.

 ROBERT W. GLOVER, ET AL.,

 Defendants, Appellees.

 

 APPEALS FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MAINE

 [Hon. D. Brock Hornby, District Judge]
 

 

 Before

 Torruella, Circuit Judge,
 
 Coffin, Senior Circuit Judge,
 
 and Boudin, Circuit Judge.
 

 

Thomas H. Kelley with whom Judson Esty-Kendall, Pine Tree Legal
 
Assistance, Inc. and Neville Woodruff were on brief for appellants.
 
Richard G. Bergeron, Assistant Attorney General, State of Maine,
 
with whom Michael E. Carpenter, Attorney General, State of Maine, H.
 
Cabanne Howard, Deputy Attorney General, State of Maine, and Thomas
 
D. Warren, Deputy Attorney General, State of Maine, were on brief for
 
appellees. 

 

 March 31, 1993
 

 BOUDIN, Circuit Judge. On July 14, 1978, Judge Edward
 

T. Gignoux, now deceased, entered a consent decree in the

district court settling a class action. The suit had been

brought under 42 U.S.C. 1983 against a number of state

officials in Maine, including the Commissioner of Mental

Health, on behalf of a class of mentally retarded Maine

citizens. A focus of the suit was the operation of Pineland

Center, a state institution for the mentally retarded.

 The 1978 consent decree embodied two sets of standards

to improve care and promote a less restrictive environment

for class members. One set applied to Pineland Center and

the other to community placement programs for the Center's

outpatients. The 1978 decree provided that it and the two

sets of standards were binding upon defendants and their

successors, that a special master would be appointed to

monitor implementation, that the court would "retain[]

jurisdiction over this matter for two years" and then

consider whether to retain it further, and that "[a]ny party

may, at any time, apply" to the court for any necessary or

appropriate orders.

 In fact Judge Gignoux continued active supervision of

the case for about five years. In brief, on September 18,

1981, Judge Gignoux discharged Pineland Center from the

court's "jurisdiction" and "supervision" after the special

master submitted a report finding that the Center was in

 -2-

compliance with the standards applicable to it. The special

master said in the same report that the Center would continue

to be bound by the decree after its discharge and would

thereafter be monitored by the state's Bureau of Mental

Retardation. 

 Then, on November 22, 1983, the court held a hearing and

issued a further order in which it "approve[d]" new

recommendations of the special master, terminated his office,

and "discharged" the remaining defendants "from the

supervision of the Court." The 1983 order further stated

that it, and the standards adopted in the 1978 consent

decree, "shall be applicable to and binding upon the

defendants and their successors." Finally, in the order the

court "reserve[d] jurisdiction over the case for a period of

three years," which might be shortened or extended upon

motion. In his report, the special master explained that

"the standards in the Consent Decree remain in force

indefinitely . . . ."

 After the 1983 order, no further motions were filed or

entries made in the docket for almost eight years. Then, on

October 23, 1991, the Consumer Advisory Board and a group of

Pineland Center residents, outpatients and guardians brought

this action on behalf of Center residents and outpatients

against the Commissioner of Mental Health and other state

officials, seeking "enforcement" of rights created under the

 -3-

1978 consent decree.1 Ignoring the formality of the new law

suit, the parties, and Judge D. Brock Hornby to whom the case

was assigned, have sensibly treated the new action as if it

were a motion filed in the earlier action to seek enforcement

of the 1978 decree. 

 In the district court the defendants asserted that the

1978 decree had been terminated by the 1983 order no later

than three years after the entry of that order, so that there

was no consent decree to enforce. Judge Hornby agreed. In a

memorandum decision, Judge Hornby concluded that the question

was what Judge Gignoux meant in his 1983 order. After

reviewing the language of the 1983 order and other indicia,

Judge Hornby found that Judge Gignoux intended to terminate

the court's authority to enforce the 1978 decree and made

this intent clear. Judge Hornby then dismissed the case,

without prejudice to a new action asserting present

violations of federal law by defendants. This appeal

followed.2

 

 1The Consumer Advisory Board was an entity created under
the decree to monitor performance and carry out other
functions. Although the state has a footnote in its brief
saying that it does not concede that the Consumer Advisory
Board has standing, it does not argue the issue in this court
nor does it question the standing of the other plaintiffs.

 2So that this case does not appear a sterile argument
about captions, we note that the state agrees that a new
action charging present federal law violations could be
brought; but at the same time, it asserts that federal law
has changed since the 1978 consent decree, see Youngberg v.
 
Romeo, 457 U.S. 307 (1982), and that the original consent
 

 -4-

 We believe that the dismissal must be vacated and the

case remanded for further proceedings. We think it plain

that the 1978 consent decree had no express termination date

and that any intent to terminate it must be based upon later

events. Whatever one might make of the reference in the 1978

consent decree to the court's retaining jurisdiction for two

years, Judge Gignoux actively supervised the case for five

years after entry of the decree in 1978 and the decree

provisions themselves contained no specific time limit.

Judge Hornby was therefore quite right to focus, as the

parties in this court do, on the 1983 order and surrounding

events. 

 We reject any suggestion by the Consumer Advisory Board

that the intent of the litigants in 1978 controls this case.

It is quite true that consent decrees are a mixture of

judgment and contract and that contract doctrine is often

used to determine the meaning of terms in a decree. United
 

States v. ITT Continental Baking Co., 420 U.S. 223, 236-37
 

(1975). But even if we assume that both sides in 1978 viewed

the decree as permanent, the district court has full power to

terminate a continuing consent decree of this kind upon a

determination that it has achieved its purpose or no longer

serves the public interest. Fed. R. Civ. P. 60(b); In re
 

Donald Pearson, No. 92-2158, slip. op. at 10-11 (1st Cir.,
 

 

decree provisions would not be adopted today. 

 -5-

March 16, 1993). Ongoing decrees to reform public

institutions, whether consented to or not, are adopted by

courts subject to that power, regardless of whether the

parties would like to bind the court forever. System
 

Federation v. Wright, 364 U.S. 642, 651 (1961); Pearson,
 

slip. op. at 10.

 Our focus, therefore, is upon the 1983 order. If its

import depended solely upon Judge Gignoux's private intent,

this would be a very close case. But it is Judge Gignoux's

expressed intent that matters, and the Supreme Court has
 

eased our task by requiring a clear statement of that intent

in order to terminate the decree. In Board of Education of
 

Oklahoma City Public Schools v. Dowell, 111 S. Ct. 630, 636
 

(1991), the Supreme Court held that the continuing injunctive

decree at issue would be deemed terminated only after "a

rather precise statement" of the district court's intention

to terminate. See also id. at 641 n. 3 (separate opinion of
 

Justice Marshall). Dowell concerned a school desegregation
 

decree, but we see no reason why a decree to reform a

different kind of state institution should stand on different

footing.3

 

 3It may be that terminating the decree in Dowell would
 
have had a double impact, not only ending the existing
obligations but making a new suit more difficult for res
 
judicata reasons. But the Supreme Court, in requiring "a
 
rather precise statement," rested simply on the need to give
due notice to both sides as to the nature of, or changes in,
decree obligations. Id. at 636.
 

 -6-

 The standard is eminently sensible. Continuing decrees

are a peculiar beast in the legal menagerie. Especially

where reform of an institution is involved, a court that has

entered such a decree may pass through levels of
 

disengagement as the decree moves toward achievement. After

entry of the decree, there is often a period of active

involvement--sometimes attended by close supervision, special

masters, and adjustment of time tables and other details.

Eventually the court may withdraw from active involvement,

and the case may even be "closed" in official records. Yet

the decree may live on as a legal obligation. If so, the

court's authority to enforce it is always capable of being

reawakened.

 To require a clear statement before termination serves

several ends. It means that those subject to a decree know

that, absent such a statement, their obligations continue.

Cf. Dowell, 111 S. Ct. at 636. A clear statement also
 

assures that those who secured or are protected by the decree

will be on notice if and when a decree is terminated, so that

they can oppose or appeal this crucial decision. Id. A
 

clear statement test also reduces the chance of confusion as

to whether the district court has merely reduced its

involvement or actually nullified an important legal

obligation. And to signal termination under this standard is

 -7-

extremely easy: all a district court need do is say that "the

decree is terminated" or use any similar phrase.

 Here, we think the state does have plausible arguments

that Judge Gignoux meant to terminate the decree, but the

other side has arguments of equivalent force. Thus, Judge

Gignoux did say in his November 22, 1983, order that he

"discharged" defendants from the court's "supervision" and

"reserve[d] jurisdiction" over the case for three years. But

the discharge from supervision clearly did not end the

decree,4 and the term "jurisdiction," while more portentous,

is a term of many shadings. There is more than one case in

which a district court has terminated its "jurisdiction" over

a decree, intending only to close the case on its docket

list, and without meaning to terminate ongoing obligations

under the decree.5

 

 4Whether the state was in full compliance with the
decree as of November 22, 1983, or instead on a course toward
full compliance, is not entirely clear from the several,
sometimes inconsistent remarks of Judge Gignoux and the
special master. But the court's order of that date, just
before retaining jurisdiction, says that "this Order and
Appendices A and B [which were attached to the 1978 consent
decree and contained the standards] shall be applicable to
and binding upon the defendants and their successors . . . ."

 5In addition to Dowell itself, where the district court
 
had entered an order terminating its "jurisdiction" over the
case, see e.g., Youngblood v. Dalzell, 925 F.2d 954, 955, 957
 
(6th Cir. 1991) (district court terminated its jurisdiction
over consent decree and "closed" the case without dissolving
the decree), and Roberts v. St. Regis Paper, 653 F.2d 166,
 
171-72 (5th Cir. 1981) (decree's provision providing for
termination of jurisdiction did not conflict with another
decree provision establishing a "permanent" seniority system,

 -8-

 The defendants also rely heavily upon the statement of

Judge Gignoux, at the hearing held on the same day as the

1983 order, that the order marked "the end of this Federal

Court's involvement with Maine's care of the mentally

retarded." This statement cannot be taken literally, for the

state clearly remained bound by the terms of the decree for

at least another three years. Moreover, Judge Gignoux's

statement must be read in the context of a proceeding

celebrating the progress made by the state. And the Consumer

Advisory Board has arguments of its own, including firm

statements of the special master--apparently never contested

until now--that the decree was an ongoing obligation that

would endure well after initial compliance was achieved.

Taking into account both the language of the 1983 order and

the surrounding circumstances, we think that the order is at

best ambiguous.6

 

as jurisdiction did not "refer[] to the life of the decree
itself"). See generally Anderson, Release and Resumption of
 
Jurisdiction Over Consent Decrees in Structural Reform
 
Litigation, 42 U. Miami L. Rev. 401, 404, 413 (1987). 
 

 6There is nothing wrong, where decree language is
ambiguous, in looking to surrounding circumstances. Still,
the further away such evidence takes us from the case at
hand, the more doubtful its value and the less bearing it has
on the district court's expressed intent. For that reason we
 
need not discuss at length a different case (Inmates of the
 
Me. State Prison v. Oliver, No. 11-187-S-D, slip op. (D. Me.
 
May 10, 1987)) which the state offers as a parallel instance
of Judge Gignoux using "jurisdiction" language to terminate a
decree. 

 -9-

 In sum, a continuing obligation was created by the

original 1978 consent decree. Nothing in the 1983 order and

surrounding circumstances comprises "the rather precise

statement" needed under Dowell to terminate the decree.
 

Interpretation of the 1983 order presents a question of law

open to plenary review, e.g., Suburban O'Hare Com'n v. Dole,
 

787 F.2d 186, 193 (7th Cir.), cert. denied, 479 U.S. 847
 

(1986), and our disagreement with the able district judge

simply underscores that the issue is fairly open to debate.

 The Supreme Court's requirement of a rather precise

statement to terminate consent decrees is not the whole

story. In Dowell the Supreme Court has made clear that
 

institutional reform decrees need not endure forever. 111 S.

Ct. at 637. See also Fed. R. Civ. P. 60(b); Pearson, slip
 

op. at 9-11. Rather, the district court has considerable

discretion, especially after years of apparent compliance

have passed, to conclude that the decree should be dissolved

because it has achieved its purpose or no longer serves the

public interest. That remedy--which can be invoked by a

motion to terminate the 1978 consent decree--remains fully

available to the state. We note the point not to express any

view upon the merits of such a motion but to make clear that

the Dowell requirement of a rather precise statement is a
 

procedural dictate and not a presumption that decrees should

live forever.

 -10-

 The judgment of the district court is vacated and the
 

case remanded for further proceedings. No costs.

 -11-