RICHARD S. ARNOLD, Circuit Judge,
dissenting.
Both the Federal Aviation Administration and this Court make an entirely plausible case for the choice of runway W-1W as the best way to expand Lambert International Airport at St. Louis, so far as air-transportation considerations are concerned. Those considerations are primarily the province of the FAA, not the courts, and our authority to review the substance of the FAA’s decision is narrow. In fact, *464 so far as the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4821 et seq. (NEPA), is concerned, we apparently are powerless to review the substance of the agency’s decision. See, e.g., Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). But there is much more to NEPA than this. The central requirement of the statute is procedural. It does not mandate particular results. But it does require that agencies considering major federal actions that will significantly affect the human environment go through a thorough process. All of the considerations, including environmental ones, that lead to the agency’s decision are to be thoroughly explored and exposed to the scrutiny of the Congress and the public.
With respect, I believe that both the FAA and this Court have misconceived the nature and purpose of the NEPA process in this case, and I therefore feel constrained to dissent. My reasons may be briefly summarized.
At the center of the NEPA process is a comparison by the agency of all of the reasonably available alternatives for solution to the particular problem confronting it — here, the decision to expand capacity and reduce delay at the airport in St. Louis. The statute requires that the agency’s decision be thoroughly explored in an Environmental Impact Statement (EIS), 42 U.S.C. § 4332(2)(C). A key part of this statement is the evaluation of all reasonable alternatives. See 42 U.S.C. § 4332(2)(C)(iii); 40 . C.F.R. § 1502.14(a) (regulations of the Council on Environmental Quality). But the statute does not stop there. Entirely apart from its provisions regarding the preparation of an EIS, the statute expressly requires a focus on alternatives to a proposed action, including different ways of accomplishing the purpose of the action. See 42 U.S.C. § 4332(2)(E). In addition, the statute requires that economic costs, which are, relatively speaking, quantifiable, be compared with environmental costs, which may seem to some “soft” or difficult to describe. Despite the difficulties, the agency must make an effort to quantify all of the costs and benefits, economic and environmental, which it takes into account. See 42 U.S.C. § 4332(2)(B). And all of this must be done not grudgingly, or in a perfunctory way, but “to the fullest extent possible.” 42 U.S.C. §. 4332(2).
I do not question for a minute the good faith and expert judgment of the FAA. But I believe the agency has violated NEPA by excluding from detailed consideration certain alternatives to its preferred solution. I begin by quoting the agency’s own description of its process:
The DEIS alternatives evaluation utilized a three-tiered evaluation process that concentrated on the purpose and need for the proposed project. The first tier evaluated whether the various alternatives met the purpose and need criteria established in Section 2.0 of the DEIS. Alternatives that satisfied these criteria were retained for evaluation under the second tier of analysis. The second tier evaluated the “constructability” ... and the benefit/cost ratio (BCR) of the alternatives.... Alternatives that met these criteria were retained for evaluation under the third tier of analysis. The third tier evaluated multiple specific criteria relating to operational efficiency (taxi times, delay times), cost per passenger (lower costs vs. higher costs) and environmental impacts (noise, land use, social, etc.).
Record of Decision at 14.
The agency’s description of its own process is clear. And, it should be said, there is nothing inherently illegal or irrational about the three-tier analytical approach it has used in this case. If, after considering all alternatives, the agency determines that certain proposed actions will not meet the purpose and need it has in mind, it need not give those alternatives further detailed consideration by comparing environmental and non-environmental costs and benefits as among them. Here, how *465 ever, it seems to me that the agency has omitted at least one reasonable alternative, referred to by the parties as NE-la, from detailed consideration. If this alternative is a reasonable one, the agency has erred in discarding it before reaching the third tier of its analysis. This question, in turn, depends on how the purpose and need that the agency is seeking to meet are defined.
The agency has defined the purpose and need of the project as increasing capacity and reducing delay at Lambert. See Appendix of the Petitioner City of Bridgeton, Volume 2, p. 317 (hereinafter cited as App.). NE-la meets this goal. It would permit a substantial increase in airfield capacity and would substantially reduce projected delay, when compared with the alternative of doing nothing. App. 2:380. FAA itself states that NE-la does meet the project’s goals with respect to the National Airspace System and does meet the hubbing and economic goals of the region. Id. at 378, 380. NE-la was rejected solely, so far as the EIS reveals, because it did not provide independent simultaneous IFR arrival capability. Certainly this is a desirable goal, and a desirable feature of any solution selected. But it is only one way of achieving increased capacity and reduced delay. As the FAA itself says, independent simultaneous instrument-flight-rules arrival capability is “one of many indicia of a capacity-building alternative.” FAA Brief 62. There are many ways of achieving the goal. Independent simultaneous capability is one such way, and it is desirable. The fact that NE-la lacks this feature, if indeed it does, might be a reason for ultimately rejecting the alternative, but it is not a reason for not comparing NE-la with W-1W on a detailed basis at the third and last tier of the agency’s analysis.
The FAA now says that although NE-la would increase capacity and reduce delay, it would not accomplish these goals so well as W-1W. This may be true, but it is only one part of the NEPA analysis. Suppose, for the sake of argument, that W-1W will increase capacity and reduce delay better than NE-la. There are still environmental costs to consider and to place in the balance, in particular, the fact that W-1W will require the relocation of over 5,000 people in the City of Bridgeton, while NE-la would require the relocation of almost no one, except people who are already going to be relocated for reasons independent of this particular project. Remember, when we talk about “environmental” considerations here, we are not talking about snail darters (however valuable they may be). We are talking about human beings, their homes and businesses. It seems to me entirely possible that the human and economic cost of moving so many people might be great enough to outweigh the increased transportation benefits of W-1W over NE-la. But, as the EIS is presently drafted, we do not know the answer to that question, because the FAA never reached it.
Is the fact (assuming for the sake of argument that it is a fact) that NE-la is inferior, purely as a matter of air-transportation policy, to W-1W sufficient to justify the exclusion of NE-la from detailed analysis? I think not. This is exactly the sort of thing that NEPA was designed for. The possibility that some substantive benefits of a project might not be great enough to justify its environmental costs is exactly the point of NEPA. In the end, the agency will make this decision, but it is allowed to do so, under the statute, only after a detailed explanation of alternatives. North Buckhead Civic Association v. Skinner, 903 F.2d 1533, 1542-43 (11th Cir.1990), is in point here. In discussing what alternatives an agency must consider, the Court said:
[A]lternatives that would only partly meet the goals of the project may allow the decision maker to conclude that meeting part of the goal with less environmental impact may be worth the trade off with a preferred alternative that has greater environmental impact.
Id. at 1542. To be sure, the facts of the case are different, but the principle underlying it is sound and applies here. Only reasonable alternatives need to be given detailed consideration, but an alternative can be reasonable even if the solution pre *466 ferred by the agency is clearly superior in substantive terms. E.g., Surfrider Foundation v. Dalton, 989 F.Supp. 1309, 1326 (S.D.Cal.1998), aff'd per curiam, 196 F.3d 1057 (9th Cir.1999).
For these reasons, I conclude that the EIS prepared by the agency in this case did not comply with the law, and I would therefore remand the case to the agency for further proceedings.
Additionally, I cannot agree that the FAA’s consistency determination satisfied the Improvement Act. The Act prevents the FAA from approving a project unless it is consistent with the plans “of public agencies authorized by the State in which the airport is located to plan for the development of the area surrounding the airport.” 49 U.S.C. § 47106(a)(1). The proposed expansion will lie almost entirely within the boundaries of the City of Bridgeton. The FAA acknowledges that Bridgeton has adopted a development plan diametrically opposed to the Wl-W alternative. Nevertheless, the FAA argues that Wl-W is reasonably consistent with local development plans because the East-West Gateway Coordinating Council, a regional planning commission, has endorsed the project. But the Council’s development plans are “solely advisory” under Missouri law; its plans exist “solely to aid” local government officials in the development of their binding plans. Mo.Ann.Stat. §§, 251.300, 251.350 (2000). A local government is not required to adopt the Council’s development plan. Mo.Ann.Stat. § 251.370 (2000). In this case, the City of Bridgeton most emphatically rejected the Council’s plan.
It distorts the plain language of the Improvement Act to find consistency under these conditions. Wl-W conflicts with the only non-advisory development plan covering the affected area. It also distorts Missouri law to use the Council’s advisory plan as grounds for ignoring a municipality’s binding zoning laws. The Court analogizes this case with Suburban O’Hare Comm’n v. Dole, 787 F.2d 186, 199 (7th Cir.1986), where a regional planning commission also approved an airport project. But the Suburban court noted only that the agreement of a regional commission provided support for a finding of consistency. Id. It declared no per se rule. Moreover, in that case, the commission’s plan was unopposed; no local municipality had adopted zoning rules directly contrary to the proposed project.
The Court worries that unless Bridge-ton’s development plan is ignored, the “interests of the National Airspace System” would be “held hostage to the conflicting plans of a single local community” even though the “relevant” planning agency has approved the plan. Ante, at 463. But under Missouri law the East-West Gateway Coordinating Council is not the relevant planning agency. Bridgeton is. Moreover, it is Congress, not Bridgeton, that has ordered the FAA to condition project approval on consistency with local planning. In attempting to block Wl-W by implementing its own contrary development plans, Bridgeton was only acting in accordance with the balance of national and local interests established by Congress, not holding the FAA “hostage.”